RUTH REYNOLDS, a nombre de PEDRO ALBIZU CAMPOS, demandante y apelante, *v.* GERARDO DELGADO, JEFE DE LA PENITENCIARÍA ESTADUAL, demandado y apelado.

*Número:* AP-63-41 *Resuelto:* 10 de noviembre de 1964

*Conrad J. Lynn, y Carlos Carrera Benítez*, abogados del peticionario y apelante; *J. B. Fernández Badillo, Procurador General, Irene Curbelo, Manuel J. Vera Mercado, Alcides*

*Oquendo Maldonado, y J. F. Rodríguez Rivera, Procuradores Generales Auxiliares,* abogados del demandado y apelado.

EL JUEZ PRESIDENTE SEÑOR NEGRÓN FERNÁNDEZ emitió la opinión del Tribunal.

El 30 de septiembre de 1953 el Gobernador del Estado Libre Asociado de Puerto Rico concedió a Pedro Albizu Campos—quien había sido convicto y sentenciado por la comisión de varios delitos contra las leyes de Puerto Rico—un indulto condicional concebido en los siguientes términos:

"Sepan todos los que la presente vieren:

"POR CUANTO, ante el Tribunal Superior de San Juan de Puerto Rico, Sala de San Juan, Pedro Albizu Campos, fue convicto y sentenciado en el año 1951 por diversos delitos en los casos F-2796 (Ataque para Cometer Asesinato); M-6336 (Infr. Art. 12—Ley núm. 67 de 13 de mayo de 1934, según enmendada); M-6341 (No Registro de Armas de Fuego); M-6338 (No Registro de Armas de Fuego); M-6340 (No Registro de Armas de Fuego); M-6337 (Infr. Art. 11—Ley núm. 67 de 13 de mayo de 1934, según enmendada); F-2795 (Infr. Ley núm. 53 de 10 de junio de 1948, según enmendada), faltando aún por cumplirse parte de dichas sentencias;

"POR CUANTO, en vista del estado de salud del confinado y de su avanzada edad, considero que éste es un caso propio para el ejercicio de clemencia ejecutiva;

"POR TANTO, Yo, LUIS MUÑOZ MARÍN, Gobernador del Estado Libre Asociado de Puerto Rico, en virtud de la autoridad que me confiere la Constitución de Puerto Rico, por la presente indulto a Pedro Albizu Campos de los delitos por que fue convicto, relevándolo de cumplir el resto de las sentencias en los casos arriba mencionados y restituyéndole todos sus derechos civiles y prerrogativas bajo la Constitución del Estado Libre Asociado de Puerto Rico, condicionado todo lo anterior a la revocación sumaria de este indulto en caso de que Pedro Albizu Campos atente o conspire contra la seguridad pública, intentando subvertir por la violencia o el terror el orden constitucional establecido e irrespetar la voluntad del pueblo de Puerto Rico democráticamente expresada en las urnas.

"De revocarse sumariamente este indulto, Pedro Albizu Campos podrá acudir ante los tribunales del país, en recurso de Hábeas Corpus, a cuestionar la determinación de incumplimiento por su parte de la condición aquí impuesta.

"Nada en este documento habrá de interpretarse como limitativo de la libertad de expresión de Pedro Albizu Campos, si tal es su interés, para luchar, por medios constitucionales y democráticos, por la independencia de Puerto Rico, u otras causas que interese.

"En Testimonio de lo Cual, he firmado la presente y hecho estampar en ella el Gran Sello del Estado Libre Asociado de Puerto Rico, en la ciudad de San Juan, hoy, día 30 de septiembre de mil novecientos cincuenta y tres.

(Fdo.) LUIS MUÑOZ MARÍN,

Gobernador" [1]

[1] Las sentencias impuestas a Albizu por el Tribunal Superior, Sala de San Juan, a que hace referencia el documento de indulto arriba transcrito, fueron las siguientes: De siete a quince años de presidio por el delito de Ataque para Cometer Asesinato, dictada en la causa F-2796 el 16 de marzo de 1951; dos años y medio de cárcel, por Infracción al Art. 12 de la Ley Núm. 67 de 13 de mayo de 1934, dictada en la causa M-6336 el 20 de febrero de 1951; seis años de cárcel por Infracción al Art. 11 de la Ley Núm. 67 de 13 de mayo de 1934, dictada en la causa M-6337 en igual fecha; nueve meses de cárcel, un año de cárcel y seis meses de cárcel, todas por poseer armas de fuego sin registrar, dictadas el 20 de febrero de 1951 en las causas M-6338, M-6340 y M-6341. Las anteriores sentencias se dictaron por hechos que tuvieron lugar durante la semana del 30 de octubre de 1950 en que ocurrió en Puerto Rico la abortada revuelta nacionalista.

El indulto comprendía también doce sentencias (ascendentes a 54 años de presidio) impuestas a Albizu en la causa F-2795 por igual número de infracciones a la Ley Núm. 53 de 10 de junio de 1948, según enmendada por la Ley Núm. 9 de 19 de agosto de 1948, 33 L.P.R.A. sec. 1471 *et seq.*— ley que hacía delito, entre otros actos, el fomentar, abogar, aconsejar o predicar, voluntariamente o a sabiendas la necesidad, deseabilidad o conveniencia de derrocar, paralizar o destruir el Gobierno de Puerto Rico, o cualquier división política de éste, por medio de la fuerza y la violencia. Esta ley fue derogada en su totalidad por la Ley Núm. 2 de 5 de agosto de 1957, siguiendo una recomendación del Comité sobre Derechos Civiles creado por el Gobernador para estudiar el estado de los Derechos Civiles en Puerto Rico. El 30 de diciembre de 1959 el propio Gobernador concedió un nuevo indulto a Albizu, pero esta vez limitó los efectos de dicho indulto exclusivamente a las doce sentencias dictadas en la causa F-2795.

El carácter del anterior indulto fue examinado por este Tribunal en *Pueblo* v. *Albizu*, 77 D.P.R. 888 (1955). En relación con la reserva de *revocación sumaria* contenida en el mismo "en caso de que Pedro Albizu Campos atente o conspire contra la seguridad pública, intentando subvertir por la violencia o el terror el orden constitucional establecido e irrespetar la voluntad del pueblo de Puerto Rico democráticamente expresada en las urnas," dijimos—pág. 895:

". . . Esta condición, si bien está implícita en el deber de todo ciudadano de obedecer la ley, fue impuesta al apelante precisamente porque se le indultaba de los efectos de actos similares—violación a la Ley 53 de 10 de junio de 1948, según enmendada—condición ésta que no iba contra la ley, la moral, ni era imposible de cumplir. Con esa condición el apelante aceptó el indulto [Se omite nota]. En el propio documento se proveyó la forma en la que, de mediar dicha revocación, según la reserva hecha, podría el indultado cuestionar 'la determinación de incumplimiento por su parte de la condición aquí impuesta'; acudiendo ante los tribunales en recurso de *hábeas corpus*. Y para situar en su apropiada esfera el alcance de la condición impuesta—precisamente porque se le indultaba, entre otras, de una violación a la citada Ley 53—y hacer patente, dentro de dicha condición, el significado de los derechos que estaba restituyendo, el Gobernador hizo constar expresamente que no debería interpretarse nada en el documento 'como limitativo de la libertad de expresión de Pedro Albizu Campos, si tal es su interés, para luchar por medios constitucionales y democráticos, por la independencia de Puerto Rico, u otras causas que interese.' "

El 6 de marzo de 1954 el Gobernador revocó(²) el indulto concedido a Albizu cinco meses antes y en esa misma fecha

---

(²) Aunque el documento de revocación aparece transcrito en la opinión emitida el 12 de mayo de 1964 en este mismo caso, creemos conveniente transcribirlo aquí nuevamente:

"Sepan todos los que la presente vieren:

"Por Cuanto, el día 30 de septiembre de 1953 autoricé el indulto de Pedro Albizu Campos de los delitos por que fue convicto y sentenciado en el año 1951, sujeto a la revocación sumaria de ese indulto si dicho Pedro Albizu Campos atentase o conspirase contra la seguridad pública, intentando subvertir por la violencia o el terror el orden constitucional esta-

éste fue ingresado nuevamente en la prisión para continuar la extinción de sus sentencias. ([3])

El 18 de septiembre de 1962 Ruth Reynolds, una norteamericana residente en Nueva York pero vinculada estrechamente a Albizu Campos—según sus propios dichos en este recurso—y con el movimiento nacionalista por él dirigido, véase *Pueblo* v. *Reynolds*, 77 D.P.R. 446 (1954), presentó

---

blecido e irrespetar la voluntad del pueblo de Puerto Rico democráticamente expresada en las urnas;

"POR CUANTO, Pedro Albizu Campos ha violado las condiciones de su indulto;

"POR TANTO, Yo, Luis Muñoz Marín, Gobernador del Estado Libre Asociado de Puerto Rico, revoco, cancelo y declaro nulo el indulto condicional otorgado a Pedro Albizu Campos con fecha 30 de septiembre de 1953.

"Se ordena, igualmente, al Jefe de la Policía de Puerto Rico que arreste inmediatamente a Pedro Albizu Campos y lo conduzca a la institución que designe el Secretario de Justicia para que cumpla el resto de las sentencias.

"En Testimonio de lo Cual, he firmado la presente y hecho estampar en ella el Gran Sello de Puerto Rico, en la Ciudad de San Juan, hoy día 6 de marzo de mil novecientos cincuenta y cuatro.
GRAN SELLO DE PUERTO RICO

(Fdo.) LUIS MUÑOZ MARÍN"

([3]) No fue hasta el 13 de noviembre de 1956—dos años ocho meses después de la revocación del indulto—que el abogado Conrad J. Lynn, de Nueva York, presentó una petición en la Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico, para inquirir sobre la legalidad de la detención de Albizu. La petición fue denegada por el fundamento de no haber Albizu acudido previamente a los tribunales del Estado Libre Asociado a ejercer su derecho de cuestionar la revocación del indulto. Véase *Lynn* v. *Delgado*, 145 F.Supp. 906. Lynn nada hizo entonces. Pasaron casi *cinco años* y el 12 de septiembre de 1961, un ciudadano residente en Raymond, New Hampshire, de nombre Arthur Harvey y de ocupación agricultor, según declaró en el *jurat* de su petición —pero a quien en su solicitud la aquí peticionaria catalogó de "indigente"— vino a Puerto Rico y presentó en este Tribunal una solicitud de hábeas corpus a nombre de Pedro Albizu Campos, habiéndose expedido el auto para ser diligenciado ante el Tribunal Superior, Sala de San Juan, el 18 del propio mes. Desestimada por dicho Tribunal su solicitud "al fallar Harvey en establecer que estaba autorizado por el prisionero para instarla a su nombre" (escolio 6 de nuestra opinión de 12 de mayo) Harvey no tomó ulterior acción ya que, según la peticionaria "siendo indigente en esa fecha y careciendo de fondos se vio forzado a regresar a los Estados Unidos Continentales."

en este Tribunal una solicitud de hábeas corpus, (⁴) jurada en Nueva York ante Conrad J. Lynn como notario. (⁵) Los trámites seguidos en el Tribunal Superior (⁶) al ser diligenciado el auto que para ante él expedimos y la disposición que en la apelación interpuesta hicimos de las cuestiones procesales suscitadas en el recurso en el tribunal a quo, aparecen explícitamente de nuestra opinión de 12 de mayo de este año. Pasemos ahora a examinar las dos cuestiones básicas en que descansa la peticionaria su contención de ilegalidad en la detención de Albizu.

## I

### Revocación Sumaria del Indulto sin Vista Previa y el Debido Proceso de Ley

Ha sido contención de la peticionaria en este recurso que si el indulto hubiera dispuesto la celebración de una vista previa a la reencarcelación por razón de alguna violación de las condiciones en él impuestas, el indulto hubiera llenado los requisitos del debido proceso de ley; (⁷) que se

---

(⁴) Esta solicitud es idéntica en sus planteamientos a la presentada por Harvey un año antes.

(⁵) El 24 de septiembre de 1962 admitimos por cortesía al abogado Lynn, bajo la Regla 8(d) de este Tribunal, a representar a la peticionaria en este recurso ante el Tribunal Superior. Luego admitimos su comparecencia ante nos en apelación y excusamos su incumplimiento con los requisitos sobre tamaño y forma de los alegatos que ya había presentado sin ajustarse a nuestro Reglamento.

(⁶) La falta de familiaridad del abogado Lynn con los procedimientos de la ley local le llevó, sin duda, a dilatar innecesariamente la apelación de su representada contra la resolución adversa del Tribunal Superior que desestimó el recurso sin entrar en sus méritos, al seguir el trámite de perfeccionar el mismo mediante la preparación de una transcripción que no necesitaba para elevar el récord de apelación a este Tribunal y hacernos los planteamientos procesales suscitados por él en el tribunal a quo, que giraban exclusivamente en torno a la suficiencia del diligenciado del auto (*return*) y de la réplica a éste (*traverse*) y sus consecuencias. No se pasó prueba ante dicho Tribunal.

(⁷) El caso de *Escoe v. Zerbst*, 295 U.S. 490, 79 L.Ed. 1566 (1935) citado por la peticionaria para sostener que la disposición sobre revocación

privó a Albizu de su libertad sin el debido proceso de ley porque se revocó el indulto y se reencarceló sin vista previa, y que está preso ilegamente, además, porque fue arrestado sin que la orden para su detención emanara de algún tribunal o autoridad judicial o estuviese de otra manera provista por ley. Aunque la peticionaria concede que al ejercer su prerrogativa de indulto el Gobernador tenía derecho a imponer condiciones, en particular las contenidas en el indulto de Albizu, [8] sostiene que al disponer su revocación sumaria el Gobernador, sin darle una audiencia previa antes de reencarcelarlo, ignoró los requisitos del debido proceso de ley que estaba obligado a observar porque actuaba en el campo de poderes constitucionales y no de poderes arbitrarios soberanos, y no realizaba un acto de gracia hacia el indultado. Este último aserto gira alrededor de unas palabras del Juez Holmes en el caso de *Biddle* v. *Perovich*, 274 U.S. 480, 486, 71 L.Ed. 1161, 1163 que examinaremos más adelante.

---

sumaria del indulto violaba el debido proceso de ley, no sostiene su contención. En dicho caso se trataba de la revocación de una sentencia suspendida por el tribunal bajo la Ley Federal de Probatorias de marzo 4 de 1925, 18 U.S.C. secs. 724–727, que en su Sec. 725 proveía que el tribunal, en cualquier momento durante el período probatorio, podía expedir una orden para que se arrestara al acusado *y se trajera ante el tribunal*, y hecho esto la corte podía revocarle la probatoria e imponerle cualquier sentencia que originalmente hubiera podido dictar.

La orden expedida por el tribunal *no dispuso que se trajera ante sí* al acusado sino que revocó la probatoria y *se ordenó la entrega de éste en la prisión* a cumplir la sentencia impuesta. Al no seguirse el procedimiento provisto por el estatuto se consideró nula la revocación. Fue al darle contenido y explicar la razón de ser de la disposición estatutaria ordenando la comparecencia ante el Tribunal, que se dijo por voz del Juez Cardozo que era claramente "para permitir a un acusado en probatoria destruir la acusación." La contención de que esa oportunidad de ser así oído tenía su base en la Constitución más bien que en el estatuto fue rechazada por el Tribunal. Véase también *Burns* v. *U.S.*, 287 U.S. 216, 77 L.Ed. 266.

[8] En la vista celebrada el 12 de febrero de 1964 el abogado Lynn hizo la siguiente afirmación: "Nosotros no disputamos que el Gobernador tenía el derecho de imponer condiciones, que él tenía el derecho de imponer estas condiciones que le impuso. . . ."

Los términos claros y precisos de las condiciones en que fue concedido el indulto en este caso no dejan, no pueden dejar, margen para los planteamientos en que funda la peticionaria su asedio a la acción del Gobernador revocando el mismo y a su consecuencia, la reencarcelación. Como ya hemos visto de su propio texto, fundándose en el estado de salud y avanzada edad de Albizu y considerando que era un caso propio para el ejercicio de la clemencia ejecutiva, el Gobernador, en virtud de la autoridad conferídale por la Constitución del Estado Libre Asociado de Puerto Rico (⁹) le indultó de todos los delitos de que había sido convicto, *relevándole de cumplir el resto* de todas las sentencias impuéstales y restituyéndole todos sus derechos civiles y prerrogativas bajo nuestra Constitución; pero quedó sujeto todo lo anterior a la reserva expresa de *revocación sumaria* en caso de que Albizu atentare o conspirare contra la seguridad pública, intentando subvertir por la violencia o el terror el orden constitucional establecido e irrespetar la voluntad del pueblo de Puerto Rico democráticamente expresada en las urnas. Esta reserva de revocación sumaria quedó sujeta a su vez, por disposición del propio Gobernador en el indulto, al trámite posterior de revisión judicial mediante Hábeas Corpus respecto a su determinación de incumplimiento, por parte de Albizu, de la condición impuesta. Es evidente que al disponer que la revisión judicial de su propia actuación fuese mediante Hábeas Corpus, el Gobernador no sólo reafirmó su disposición de que la revisión judicial de su determinación de incumplimiento fuese un trámite posterior a la revocación, sino que de hecho proclamó en el propio documento de indulto que el *status* de Albizu habría de retornar al de detenido,

---

(⁹) Art. IV, Sec. 4, pár. 8 "Suspender la ejecución de sentencias en casos criminales, conceder indultos, conmutar penas y condonar total o parcialmente multas y confiscaciones por delitos cometidos en violación de las leyes de Puerto Rico. Esta facultad no se extiende a los procesos de residencia."

como consecuencia inmediata de la revocación, para que surgiera entonces su derecho a cuestionar dicha determinación. En efecto, ése es el significado de la referencia al recurso de Hábeas Corpus, ya que en virtud del alcance limitado a que inherentemente está sujeta la revisión judicial de la actuación ejecutiva[10]—investigar si fue arbitraria o irrazonable—el Hábeas Corpus en verdad deja de ser tal recurso porque pierde su virtualidad intrínseca de ataque colateral y adquiere la verdadera naturaleza del remedio de revisión judicial limitada. [11]

Reiteramos aquí lo dicho en *Pueblo* v. *Albizu*, supra, en cuanto al alcance y naturaleza condicional del perdón así concedídole y a los efectos de su aceptación. Un indulto es un acto de clemencia ejecutiva, que no forma parte en sí del proceso penal que culmina en la convicción de un acusado. A su disfrute adviene un convicto, no como parte de derecho alguno que le sea reconocido por el orden jurídico vigente, sino mediante la concesión de una gracia[12] por el Poder Ejecutivo. El hecho de que en esta jurisdicción el poder de indulto emane de nuestra Constitución—*Emanuelli* v. *Tribunal de Distrito*, 74 D.P.R. 541, 548 (1953)—no le resta autoridad al Gobernador para, al conceder indultos, imponer aquellas condiciones que a su juicio el interés general requiera, siempre que tales condiciones—como indicamos en *Pueblo* v. *Albizu*, supra, siguiendo la doctrina prevaleciente sobre la cual no hay discrepancia—no vayan contra la ley, la moral, o sean imposibles de cumplir. [13]

---

[10] Hochman, *Judicial Review of Administrative Processes, etc.,* 74 Harv. L. Rev. 684; Fahy, *Judicial Review of Executive Action,* 50 Geo. L.J. 709.

[11] *Federal Habeas Corpus; Review of "Final" Administrative Decisions,* 56 Colum. L. Rev. 551.

[12] En el propio caso de *Escoe* v. *Zerbst*, supra, se caracteriza al indulto condicional como un acto de gracia ejecutiva.

[13] Véanse notas en 24 Minn. L. Rev. 584 y 6 Fordham L. Rev. 255, 262, 341.

Las palabras del Juez Holmes en *Biddle* v. *Perovich,* supra, en que hace énfasis la peticionaria para sostener que la condición de revocación sumaria del indulto es nula porque privaba al indultado de la oportunidad de ser oído antes de la revocación, no tienen el alcance que ésta le atribuye, ni sostienen tampoco su punto de vista de que la aceptación del indulto con la indicada condición no obligaba al indultado a su cumplimiento. Éstas son las palabras del Juez Holmes: "Un indulto en nuestros días no es un acto de gracia privado de un individuo en posesión de ese poder. Es parte del plan constitucional. Cuando se concede constituye la determinación de la autoridad máxima de que el bienestar público quedará mejor servido imponiendo menos que lo fijado en la sentencia. Véase *Ex parte Grossman,* 267 U.S. 87, 120, 121, 69 L.Ed. 527, 535, 38 A.L.R. 131, 45 Sup. Ct. Rep. 332. Así como la sentencia original ha de imponerse sin tener en cuenta el consentimiento del acusado aunque no le guste, es el bienestar público, no su consentimiento, lo que determina qué debe hacerse. . . ." 274 U.S. 486, 71 L.Ed. 1163. ([14])

Bajo la misma filosofía que informa la anterior glosa del Juez Holmes, debe tenerse aquí presente que si bien la concesión del indulto a Albizu puede considerarse como una determinación del Gobernador—como autoridad máxima en materia de indultos—de que el bienestar público quedaba así mejor servido, fue también determinación coetánea del propio Gobernador la de que no estaría el bienestar general tan bien servido, si no se reservaba el poder de revocar sumaria-

---

([14]) En este caso se trataba de un convicto de asesinato que fue sentenciado a la pena de muerte en Alaska y a quien el Presidente le conmutó la sentencia por la de prisión perpetua "en una penitenciaría a ser designada por el Procurador General de los Estados Unidos." En tal virtud fue trasladado de una cárcel en Alaska a la Penitenciaría de Leavenworth en Kansas. Varios años después instó recurso de Hábeas Corpus fundado en que su traslado de una cárcel a una penitenciaría y la Orden del Presidente habían sido hechas sin su consentimiento y carecían de autoridad legal. El Tribunal Supremo Federal, por voz del Juez Holmes resolvió que el Presidente tenía autoridad para conmutar la sentencia sin que tuviera que mediar el consentimiento del convicto.

mente dicho indulto, en caso de llevar a cabo Albizu alguno de los actos cuya comisión deseaba desalentar el Ejecutivo mediante la condición impuesta y la cual, por su propia naturaleza, tendía a su vez a proteger el verdadero bienestar general de la comunidad: la seguridad pública, el orden constitucional establecido y la voluntad democrática del pueblo expresada en las urnas. No podía desconocer el Gobernador, al imponer la condición para el perdón, los antecedentes del indultado respecto a actos previos de similar naturaleza a los que podían ocasionar la revocación, y por los cuales había sido anteriormente convicto. ([15])

■ Bajo las condiciones contenidas en el documento de indulto, no puede surgir aquí la cuestión de falta de debido proceso de ley porque, aparte de la reserva de revocación sumaria contenida en el propio indulto, *Pueblo* v. *Albizu*, supra, y Weihofen, *Revoking Probation, Parole or Pardon without a Hearing*, 32 J. Crim. L., C. & P.S. 531, 532, n. 8, aquí se proveyó expresamente para la revisión judicial si el perdón se revocaba sumariamente.

■ En *Fleenor* v. *Hammond*, 116 F.2d 982 (6th Cir. 1941), se sostuvo que bajo los términos del indulto condicional allí envuelto, el derecho de un indultado a disfrutar de su libertad no podía serle revocado sin la oportunidad de ser oído que generalmente acompaña al debido proceso de ley siempre que la revocación se impugnara bajo alegaciones inequívocas de que el peticionario había cumplido con las condiciones del perdón. Es de rigor advertir, sin embargo, que en dicho caso el Gobernador no proveyó en el indulto para la revisión judicial cuando se reservó la facultad de revocación del mismo, y que es doctrina común en las jurisdicciones estatales que cuando se reconoce el derecho a vista y revisión judicial en cuanto a la determinación de incumplimiento de las condiciones de un indulto, se considera aquél cumplido si se da al

---

([15]) *Albizu* v. *United States*, 88 F.2d 138.

indultado la oportunidad de ser oído a través de un recurso de Hábeas Corpus. Véase *Pardon and Parole—Necessity of Due Process to Revoke*, 24 Minn. L. Rev. 584 *et seq*. Dado el carácter de la gracia ejecutiva aquí ejercida y los términos y condiciones en que fue concebido y aceptado el indulto, no cabe imputar falta de debido proceso de ley en el mecanismo provisto en dicho documento para el caso en que éste fuera revocado por el fundamento de incumplirse la condición impuesta en el mismo.

 Consecuente con la naturaleza del acto de clemencia ejecutiva con que se vio favorecido Albizu, y de acuerdo con los términos y condiciones del indulto, fue que el Gobernador, fundado en la violación de las condiciones impuestas, revocó, canceló y declaró nulo el mismo y, en consecuencia, ordenó el arresto y reingreso inmediato de Albizu a la institución que designare el Secretario de Justicia para que continuara el cumplimiento del resto de las sentencias.[16] La disposición de nuestra Constitución que provee que "Sólo se expedirán mandamientos autorizando . . . arrestos por autoridad judicial y ello únicamente cuando exista causa probable apoyada en juramento o afirmación . . ."[17] no tiene sitio de aplicación en este caso, pues aquí no se trata de una

---

[16] Aunque el poder para disponer su reingreso en la prisión era incidental y una consecuencia de su poder para revocar el indulto, según las condiciones en él consignadas, obsérvese que de acuerdo con la Sec. 11 de la Ley Núm. 266 de 4 de abril de 1946, 4 L.P.R.A. sec. 610, una persona indultada condicionalmente por el Gobernador continúa "bajo la custodia legal del Gobernador de Puerto Rico, quien podrá a recomendación de la Junta, o a su arbitrio, cancelar la orden de liberación condicional a que se refiere esta sección y ordenar que la persona sea ingresada en la institución de donde fue excarcelada para el cumplimiento del resto de la sentencia que faltare por cumplir." Cf. *In re Saucier*, 167 A.2d 368 (1961); *In re Charizio*, 138 A.2d 430 (1958); *State ex rel. Murray* v. *Swenson*, 76 A.2d 150 (1950).

Esta acción se refiere a "la concesión de cualquier forma de clemencia ejecutiva e indulto," a ser concedida por el Gobernador, a distinción de la libertad bajo palabra a concederse por la propia Junta bajo las demás disposiciones de la referida ley.

[17] Art. II, Sec. 10, párr. 3.

determinación de causa probable para verificar el arresto de un ciudadano antes de convicción en una causa criminal, sino de una determinación administrativa eminentemente discrecional hecha por el Ejecutivo en primera instancia revocando un perdón condicional a un convicto, en el uso de su autoridad constitucional, conforme a los términos del propio documento en que funda aquél el reclamo del derecho de libertad que aquí invoca. En cuanto a esta determinación del Ejecutivo no existe exigencia constitucional alguna que limite el ejercicio de su prerrogativa para conceder indultos condicionales o que exija, como cuestión de debido proceso de ley, ni la vista previa para revocarlos en las circunstancias de este caso, ni la determinación de la autoridad judicial para reencarcelar incidentalmente a la revocación.

Desestimamos, en consecuencia, el primero de los dos planteamientos de la peticionaria.

## II

### *Suficiencia de la Prueba para la Revocación del Indulto*

En su solicitud la peticionaria sostuvo que la detención de Albizu era ilegal por cuanto la revocación del indulto condicional se hizo sin que hubiera mediado violación de parte del indultado de las condiciones impuestas en el mismo. En nuestra anterior opinión en este caso, y en ánimo de entrar de una vez a investigar la legalidad de la detención de Albizu, descartamos todo vestigio de refinamiento procesal y consideramos incorporada a la réplica (*traverse*) la negación hecha en la solicitud respecto a la violación de las condiciones del indulto, fundando nuestra determinación en la alegación de la réplica de que "El peticionario niega la existencia de hechos para sostener tales conclusiones de derecho." Esa ha sido su posición respecto a la suficiencia de la prueba pasada en este recurso para justificar la revocación del indulto hecha por el Gobernador.

El día de la vista ante nos, el demandado presentó un diligenciado (*return*) enmendado y además, en el curso de la misma, solicitó y obtuvo permiso para una enmienda adicional, que luego de formulada oralmente sometió también por escrito.

La peticionaria, a su vez, hizo las siguientes admisiones de las alegaciones del diligenciado, con la salvedad de que si bien admitía la ocurrencia de los hechos en ellas alegados, los mismos eran irrelevantes al caso para determinar la legalidad de la detención de Albizu, siendo su posición a través de todo el procedimiento que sólo era pertinente y admisible prueba de hechos ocurridos entre el 30 de septiembre de 1953—fecha del indulto—y la noche del 5 de marzo de 1954, cuando le fue revocado el mismo:

"(a) Una vez en libertad por razón del indulto concedídole el 30 de septiembre de 1953, Pedro Albizu Campos fijó su residencia en los cuarteles generales de la agrupación denominada 'Partido Nacionalista de Puerto Rico,' reanudó sus funciones como líder de dicha agrupación y en tal capacidad continuó dirigiendo las actividades de la misma."(18)

---

(18) La peticionaria igualmente sostuvo que era irrelevante la siguiente materia que como escolio se hizo formar parte del párrafo (a) arriba transcrito, *Guadalupe* v. *Bravo*, 71 D.P.R. 975 (1950):

"Hace años existe en esta Isla un movimiento separatista impulsado por un grupo de individuos, encaminado a conseguir la separación de Puerto Rico de los Estados Unidos por medio de la fuerza y la violencia. Prueba de ello es que en el caso de *Albizu* v. *United States*, 88 F.2d 138 (C.C.A. 1, 1937), al revisar en apelación una sentencia de la Corte de Distrito de los Estados Unidos para Puerto Rico, dictada contra un grupo de líderes nacionalistas por un delito de conspiración para derrocar por la fuerza y la violencia el gobierno de los Estados Unidos en Puerto Rico, la Corte de Apelaciones de los Estados Unidos para el Primer Circuito, luego de detallar la evidencia presentada se expresó así:

" 'Hubo abundante evidencia de muerte y otros actos de violencia en los cuales estaban envueltos miembros del Partido Nacionalista, actos que constituían el resultado de los discursos enardecedores y revolucionarios de Albizu y de los artículos publicados en "La Palabra" de Corretjer y en los otros periódicos mencionados, especialmente en "Armas" editado por el acusado Vélez (se refiere a Clemente Soto Vélez) y en consonancia con las resoluciones adoptadas en la convención celebrada en Caguas el 8 de diciembre de 1935.'

"(b) El 1ro. de marzo de 1954 miembros de la agrupación Partido Nacionalista de Puerto Rico, a saber: Lolita Lebrón, Rafael Cancel Miranda, Andrés Figueroa Cordero y Irving Flores, llevaron a cabo un tiroteo en la Cámara de Representantes de los Estados Unidos de América, en el cual resultaron heridos los congresistas Alvin M. Bentley, Ben F. Jensen, Kenneth A. Roberts, Clifford Davis y George H. Fallon."[19]

---

"De los sucesos de la semana del 30 de octubre de 1950 tomamos conocimiento judicial—*De Castro* v. *Junta de Comisionados*, 59 D.P.R. 676; *Pueblo* v. *Torregrosa*, 57 D.P.R. 775—sucesos que culminaron en la Resolución Concurrente Núm. 1 de la Asamblea Legislativa de Puerto Rico de 8 de noviembre de 1950, de la cual también tomamos conocimiento judicial. En ésta se dice:

"'POR CUANTO: Como resultado de estas tácticas el lunes 30 de octubre miembros del grupo nacionalista asaltaron la residencia oficial del Gobernador de Puerto Rico con ánimo de asesinarlo. Dentro de las siguientes 72 horas miembros del grupo nacionalista atacaron cuarteles de policía, incendiaron hogares, asaltaron hospitales y llevaron su campaña de trágica irresponsabilidad suicida hasta la capital nacional intentando asesinar al Presidente Truman; . . . .'"

[19] Igualmente sostuvo que era irrelevante la siguiente Resolución Concurrente del Senado de Puerto Rico, Núm. 22 de 1ro. de marzo de 1954, que como escolio se hizo formar parte del párrafo (b) arriba transcrito:

"Se están recibiendo en estos momentos despachos de Wáshington informando que un grupo de personas penetró en el Hemiciclo de la Cámara de Representantes de los Estados Unidos y atacó alevosamente a los miembros de dicho Alto Cuerpo allí reunidos, resultando heridos distinguidos miembros del Congreso de los Estados Unidos. Los asaltantes han sido identificados como afiliados al exiguo grupo de terroristas que se hace llamar Partido Nacionalista de Puerto Rico.

"El Pueblo de Puerto Rico condena y repudia siempre las actuaciones de ese grupo de terroristas fanatizados.

"Entre Puerto Rico y los Estados Unidos existen vínculos mantenidos por la ciudadanía común y el respeto mutuo por la voluntad tanto del pueblo de Puerto Rico como del Congreso de los Estados Unidos.

"POR TANTO: Resuélvase por la Asamblea Legislativa de Puerto Rico a nombre de todo el Pueblo de Puerto Rico:

"1. Repudiar y condenar en la forma más enérgica el cobarde e inconcebible atentado contra la vida de hombres que representan a un pueblo por la libre voluntad de ese pueblo.

"2. Declarar ante el mundo que el acto que ahora repudiamos y condenamos, lejos de responder a expresión alguna del pueblo de Puerto Rico, representa una agresión contra nuestro pueblo mismo y levanta en nosotros tal grado de ira e indignación que es difícil describir en cualquier lenguaje.

"3. Trasmitir al Congreso de los Estados Unidos y a los distinguidos congresistas heridos la adhesión y solidaridad de la Asamblea Legislativa y de todo el pueblo de Puerto Rico."

320

"(c) Inmediatamente después de estos sucesos Pedro Albizu Campos hizo manifestaciones públicas que aparecieron en el periódico 'El Imparcial' el día 3 de marzo de 1954, mediante las cuales justificaba los hechos ocurridos en el Congreso y calificaba los mismos de 'jornada de sublime heroísmo.' "[20]

[20] El texto de dichas manifestaciones, que se incorporaron por vía de escolio al párrafo (c) arriba transcrito, es el siguiente:

"Nuestra patria ha venido sufriendo la intervención militar de Estados Unidos hace más de medio siglo. La intervención militar es la guerra en todos sus aspectos: económico, político, cultural, etc., porque las intervenciones militares se llevan a cabo con un solo fin que es destruir la nacionalidad ocupada y convertirla en colonia del Imperio, explotable en todas sus formas.

"Las consecuencias de la intervención militar de Estados Unidos en Puerto Rico ya no constituyen misterio para persona alguna en el mundo. Sencillamente han sido demoledoras, destructoras de nuestra nacionalidad.

"Nuestra fe en el derecho nos dio una infinita paciencia para resistir los desmanes del poder ocupante norteamericano. Esa paciencia nuestra ha confundido a los dirigentes de Estados Unidos que nos catalogaron entre los pueblos pasivos de la tierra y los llevó hasta la insolencia de que, siendo víctimas de su imperio, pretenden reclutar a nuestros hijos por la fuerza para servir a sus fines imperialistas en el mundo entero.

"Como por la Constitución de Estados Unidos toda ley imponiendo una contribución tiene que originarse en la Cámara de Representantes de ese país, y siendo el Servicio Militar Obligatorio la contribución de sangre, la máxima contribución que se puede imponer, es en esa Cámara donde se han iniciado todas las leyes de Servicio Militar Obligatorio que ha impuesto Estados Unidos a Puerto Rico.

"Es en esa Cámara de Representantes donde ha llegado la repulsa puertorriqueña a su intensidad trágica.

"El despotismo extranjero se ejerce por ley de la nación despótica. Son los congresos y los parlamentos los que establecen el legalismo despótico. Es el Congreso de Estados Unidos el cuerpo responsable de la intervención militar de Estados Unidos en Puerto Rico por más de 50 años.

"Los señores senadores y diputados de ese cuerpo legislativo son los que nos mandan lo que llaman ellos sus 'cartas orgánicas,' o sea, las cartas con que tallan la esclavitud imperialista. Esos señores tienen la suprema insolencia de clasificar a Puerto Rico como un terreno público de Estados Unidos. Así también, los organismos judiciales de Yanquilandia vienen a ejercer autoridad en Puerto Rico y autoridad judicial, y los presidentes de Estados Unidos con el mayor descoco se atreven decir qué parte, si parte, o el todo del territorio nacional puertorriqueño es un bosque de Estados Unidos.

"No sabemos cómo una nación ha podido aguantar tanta insolencia por tanto tiempo.

"Se repite la historia: porque la mujer encarna la nacionalidad. Porque es ella siempre, un valor representativo; es ella y la posteridad.

"(d) El día 6 de marzo, cuando los agentes del orden público se personaron en la residencia de Pedro Albizu Campos para diligenciar la Orden ejecutiva mediante la cual se revocaba el indulto y se ordenaba el arresto del mismo, éste y sus seguidores Doris Torresola, Carmen María Pérez, Isabel Rosado Morales y José Rivera Sotomayor, todos miembros de la agrupación denominada 'Partido Nacionalista de Puerto Rico,' hicieron resistencia y recibieron a tiros a los miembros de la Policía."

"(e) Una vez efectuado el arresto de Pedro Albizu Campos y de sus mencionados seguidores, se realizó una inspección del local en el cual fueron apresados y se ocupó un gran número de armas y municiones."

La siguiente alegación, que fue adicionada el día de la vista al párrafo (a) de la contestación, no fue aceptada y quedó por tanto controvertida:

"Durante el período envuelto en este recurso la agrupación denominada Partido Nacionalista de Puerto Rico predicaba conseguir la separación de Puerto Rico de los Estados Unidos por medio de la fuerza y la violencia."

A fin de pasar a examinar la pertinencia y efecto jurídico que en la resolución de este caso han de tener todos los elementos de prueba a ser considerados, incluyendo las admi-

---

"Una heroína puertorriqueña de sublime belleza ha vuelto a señalar para la historia de todas las naciones que la mujer es la patria y que no se puede concebir a la madre esclava. Tampoco es posible albergar la idea de que la patria sea esclava.

"Lolita Lebrón y los caballeros de la raza que la acompañaron en esa jornada de sublime heroísmo, han avisado a Estados Unidos, envalentonados con sus bombas atómicas, que el deber los obliga a respetar la independencia de todas las naciones; a respetar la independencia de Puerto Rico. Y que los puertorriqueños harán respetar ese derecho sagrado de la patria."

Las anteriores manifestaciones se consideraron por la peticionaria irrelevantes al caso porque: (1) no indicaban que Albizu participara en el acto en sí; (2) que planeara el ataque al Congreso; y además porque (3) eran sólo una expresión de su propio criterio dentro de su derecho de libertad de palabra, y (4) los términos del indulto específicamente señalaban que Albizu no subvertiría el Gobierno de Puerto Rico, mientras que los cuatro nacionalistas que atacaron al Congreso fueron juzgados y convictos por ataque contra el Gobierno Federal, contra la integridad del Congreso de los Estados Unidos y no contra el Gobierno de Puerto Rico.

siones anteriormente señaladas así como el conocimiento judicial, pasamos seguidamente a reseñar en forma breve la prueba adicional ofrecida por el demandado el día de la vista en apoyo de actuación ejecutiva revocando el indulto.

*Declaración jurada del Capitán Benigno Soto:*

Se ofreció y admitió, por estipulación de las partes, en sustitución de su testimonio en la silla testifical y con la salvedad de la peticionaria de que consideraba los hechos en ella expuestos irrelevantes al procedimiento, una declaración prestada bajo juramento por el Capitán de la Policía de Puerto Rico, Benigno Soto, el día 9 de marzo de 1954 ante el Fiscal Especial General que investigó los sucesos acaecidos en la madrugada del 6 del propio mes, en ocasión en que el testigo y otros agentes del orden público diligenciaban varias órdenes de arresto, expedidas por autoridad judicial, contra varios miembros del Partido Nacionalista[21] que se encontraban en el local de las oficinas de la "Junta Nacional" de dicha agrupación en San Juan, donde a la vez residía su Presidente Pedro Albizu Campos, en cuya ocasión se cumplimentaba también la orden de revocación de indulto del Gobernador y mandato para el arresto y reencarcelación del propio Albizu conforme a los términos de dicha orden.

Esta declaración expone los hechos en que fundó el demandado su alegación del párrafo (d) de la Contestación,

---

[21] Las personas contra quienes tenía en su poder órdenes de arresto el Capitán Soto, por violación a la Ley Núm. 53 de 10 de junio de 1948, entonces en vigor, según enmendada a esa fecha, y que resistieron el arresto en batalla a tiros con la policía, pero que finalmente se rindieron y fueron en efecto arrestadas, *Pueblo* v. *Rivera Sotomayor*, Núm. 16041, res. 10 de junio de 1960 (todo lo cual, desde luego, es de conocimiento del Tribunal) fueron José Rivera Sotomayor, Doris Torresola y Carmen María Pérez. Isabel Rosado Morales también tomó parte en la resistencia ofrecida a la policía en dicha ocasión, y fue también allí arrestada. Contra Albizu Campos tenía en su poder el Capitán Soto la orden de revocación de indulto, contentiva también del mandato para su arresto y reencarcelación.

la cual, según indicamos anteriormente, fue admitida sujeta a la posición de la peticionaria de que toda vez que la revocación del indulto había ocurrido previamente a la resistencia ofrecida por Albizu y sus seguidores en esa ocasión, dicha prueba era irrelevante; y sustancia también la alegación del párrafo (e) de la Contestación en cuanto a las armas y municiones que inmediatamente después del arresto de Albizu y demás miembros de su organización se ocuparon en el referido local de las oficinas centrales del "Partido Nacionalista de Puerto Rico."

*Testimonio de Francisco Cortés Ruiz:*

El demandado sentó en la silla de testigos a Francisco Cortés Ruiz. La siguiente es una síntesis de su testimonio: Su nombre, el ya dicho, 42 años de edad. Fue miembro activo del Partido Nacionalista de Puerto Rico desde el año 1951 hasta el año 1953. En 1950 llegó a Chicago y Gonzalo Lebrón Sotomayor (casado con una prima de Cortés Ruiz) le empezó a hablar de nacionalismo y lo convenció. Así ocurrió su ingreso al Partido Nacionalista. Gonzalo Lebrón era delegado del Partido Nacionalista de Puerto Rico en la ciudad de Chicago. La Junta de Chicago era una Junta oficial del Partido Nacionalista de Puerto Rico, una rama del nacionalismo puertorriqueño. Seis o siete meses después de haber ingresado Cortés Ruiz en el Partido Nacionalista lo hicieron Presidente de la Junta de Chicago. Su ingreso al Partido lo había hecho aproximadamente en Junio de 1951 y para principios del 1952 advino como Presidente de la Junta. La mayor parte del tiempo se dedicaban a actividades cívicas para recaudar fondos. El dinero colectado se enviaba por giro, en carta que escribía Gonzalo Lebrón Sotomayor y firmaba Cortés Ruiz, como Presidente, al Lic. Juan Hernández Vallé. Lebrón era "el cerebro del Partido Nacionalista en esa ciudad." La Junta de Chicago también "colectaba dinero para comprar armas de fuego." Allá para 1953 compró cuatro pistolas,

tres de ellas Luger (²¹ᵃ) y una P-38, que fueron compradas
en una tienda de nombre Escaramuza, cuyo dueño las envió a
Gary, Indiana. A ese pueblo fue a levantarlas Cortés Ruiz
para llevarlas a Chicago, acompañado de otro miembro del
Partido Nacionalista en esa ciudad llamado Ángel Luis
Medina. En otra ocasión en 1953 compraron dos pistolas más
y una carabina.

Cortés Ruiz fue Presidente de la Junta de Chicago hasta
"el 1952" en que enfermó y regresó a Puerto Rico para some-
terse a una operación de la garganta. Después de operado
visitó al Lic. Juan Hernández Vallé en la Calle Fortaleza 56,
altos, porque "quise verlo para ver a quién se le enviaba el
dinero que se colectaba en la ciudad de Chicago." A su re-
greso a esa ciudad Gonzalo Lebrón le designó instructor mili-
tar de la Junta Nacionalista, siendo su encomienda la de en-
señar a sus miembros a cargar y descargar las armas. En
octubre de 1953 volvió a Puerto Rico vía Nueva York tra-
yendo consigo una carta de Gonzalo Lebrón para el Lic.
Juan Hernández Vallé e instrucciones de que se pusiera a la
disposición de éste. Con anterioridad a ese viaje a Puerto
Rico vía Nueva York, Cortés Ruiz había hecho otro viaje
de Chicago a Nueva York en compañía de Ángel Luis Medina
"en la segunda parte de 1953" para llevar las cuatro pistolas
que habían comprado y entregarlas al movimiento Naciona-
lista en dicha ciudad. Llevó instrucciones de Gonzalo Lebrón
de verse en Nueva York con Julio Pinto Gandía, quien de-
signó a Juan Francisco Ortiz Medina para que recogiera las
armas. En la casa de Rosa Collazo, esposa "de un naciona-
lista que está preso," de nombre Oscar Collazo, se vio con el
Lic. Hernández Vallé.

Cuando viajó a Puerto Rico en octubre de 1953 lo hizo
acompañado de un nacionalista de Chicago llamado Wilfredo

(²¹ᵃ) El testigo declaró "Lugar" según comprueba la grabación mag-
netofónica de su testimonio. En la transcripción erróneamente aparece
"Ludwig" en dos ocasiones.

Sánchez Morales. Éste trajo un revólver viejo y Cortés Ruiz una pistola. En la visita que hizo a Hernández Vallé en la oficina de éste en San Juan para entregarle la carta que le enviaba Gonzalo Lebrón, Hernández le preguntó "cómo estaban los muchachos" y si tenía algún arma de fuego. Inquirió si iba a ver a Albizu y a su respuesta afirmativa lo envió al Cuartel General del Partido Nacionalista con una señora que estaba en la oficina. Allí esperó en un cuarto, que no era el de Albizu, y como a los 15 minutos llegó Hernández Vallé quien pidió y obtuvo permiso para que Cortés pasara a ver a Albizu. En parte de la entrevista éste le habló a Cortés del trato cruel que le estaban dando, "que le estaban aplicando rayos." Así relató el testigo Cortés este episodio: "Entonces me dijo don Pedro Albizu Campos que me virara para atrás rápidamente, que le dijera a Julio Pinto Gandía allá en Nueva York y a Gonzalo Lebrón Sotomayor en Chicago, que se dejaran de tanta comedia de patriotismo, que si el trato cruel que estaba recibiendo don Pedro Albizu Campos lo estuvieran recibiendo ellos, dirigiéndose a Gonzalo Lebrón y Julio Pinto Gandía, él barría el pedazo a tiros. Entonces me dio un abrazo y me despidió." El testigo salió del cuarto y Hernández Vallé le dio una palmada en la espalda diciéndole, "Paco, haz la digestión de eso."

Luego de esa ocasión Cortés Ruiz se retiró del Partido Nacionalista porque se dio cuenta que no podía seguir las normas del Partido, "matar a nadie en las condiciones que ellos querían." Cortés fue procesado y convicto en una Corte federal de Nueva York, "por ser nacionalista y cargar armas y transportación de armas de un estado a otro." ([22]) Las ar-

---

([22]) Véase *United States* v. *Lebrón* (*et al.*), 222 F.2d 531. La acusación por conspirar para derrocar el Gobierno de los Estados Unidos mediante la fuerza y la violencia—18 U.S.C. sec. 2384—seguida en la Corte de Distrito de los Estados Unidos para el Distrito Sur de Nueva York, incluyó a otras 16 personas, además de Cortés Ruiz, entre las cuales se encontraban los 4 nacionalistas que atacaron el Congreso el 1ro. de marzo de 1954 y Hernández Vallé, Julio Pinto Gandía, Gonzalo Lebrón, Ángel Luis Medina y otros nacionalistas de Chicago y Nueva York.

mas utilizadas en el atentado contra los congresistas el 1ro. de marzo de 1954 se parecían mucho a las que el testigo había comprado en Chicago "porque había una pistola de cañón blanco Luger" y algunas 38.

En la repregunta el testigo declaró que había sido acusado en Nueva York junto a Gonzalo Lebrón Sotomayor, Ángel Luis Medina, Carlos Aulet y otros que no recordaba de momento. No recordaba si se había incluido en la acusación a Julio Pinto Gandía y Hernández Vallé. Hizo alegación de culpabilidad y le impusieron cinco años en probatoria. Fue dictada sentencia luego de haber declarado "en la acusación mía." No sabía dónde se encontraba Albizu cuando él se unió al Partido Nacionalista en 1951, pero sabía que Hernández Vallé era el líder del Partido en aquel entonces. Cuando visitó a Albizu creyó que estaba muy enfermo. No hizo "la digestión" de lo que le dijo Albizu, como le insinuó Hernández Vallé, y como consecuencia de ello se separó del Partido Nacionalista.

La peticionaria no ofreció prueba alguna.

 Los hechos admitidos por la peticionaria, junto al conocimiento judicial de este Tribunal y los aportados por el testimonio de Francisco Cortés Ruiz, aparte de la declaración del Capitán Benigno Soto, son suficientes para justificar la actuación del Gobernador revocando el indulto. Aunque la norma jurídica para determinar la justificación de la revocación del perdón por el Gobernador debe fundarse en si dicha actuación fue o no arbitraria, o sea, en la razonabilidad de su actuación, los elementos de prueba aquí disponibles satisfacen aun exigencias mayores que la de esa norma.

A salvo el principio de la norma jurídica aplicable bajo la menor exigencia de ausencia de arbitrariedad de la actuación del Ejecutivo, examinemos la prueba a la luz de la más exigente norma de causa probable de delito, en vista de la naturaleza de la actividad que la condición impuesta en el indulto prescribía como causa para su revocación. Dicha

condición, según expresada en el documento, anticipaba, como causa para la revocación, el que "Pedro Albizu Campos atente o conspire contra la seguridad pública, intentando subvertir por la violencia o el terror el orden constitucional establecido e irrespetar la voluntad del pueblo de Puerto Rico democráticamente expresada en las urnas." De suerte, pues, que la condición quedaba cumplida si el indultado (1) realizaba algún acto, por sí, atentatorio contra la seguridad pública, mediante actos de violencia o terror, con la intención de subvertir el orden constitucional vigente, aun cuando no hubiere conspiración propiamente dicha, o si (2) podía serle imputado algún acto de esa naturaleza, como parte de una conspiración.

██ Los elementos de prueba aportados e invocados para medir la actuación del ejecutivo revocando el indulto, indican que es dentro de la modalidad de la conspiración, y no en hechos propios de violencia o terror llevados a cabo por el indultado, en que descansa la justificación para la revocación. Siendo ello así es claramente improcedente la contención de la peticionaria de que únicamente prueba sobre actuaciones propias de Albizu desde el 30 de septiembre de 1953, fecha del indulto, hasta la noche del 5 de marzo de 1954 en que le fue revocado el mismo, es pertinente en este procedimiento, pues cuando existe una conspiración de carácter continuo, como veremos más adelante, en la que una agrupación impulsa un objetivo final por medio de la fuerza y el terror, el carácter de esta agrupación y sus prácticas reveladoras de los medios ilegales puestos en marcha para la realización de sus propósitos son pertinentes para establecer la naturaleza de la actividad grupal de la cual responderían bajo ciertas exigencias de conocimiento y nexo, los miembros que participan en ese objetivo común.

██ Es regla conocida que una vez probada la existencia de una conspiración las actuaciones y manifestaciones de uno de los co-conspiradores en el transcurso de la

misma son admisibles contra todos. *Albizu* v. *U.S.*, 88 F.2d 138 (1st Cir. 1937). Tomamos conocimiento judicial, al igual que lo hicimos en *Guadalupe* v. *Bravo*, 71 D.P.R. 975 (1950), de los sucesos de la semana del 30 de octubre de 1950 en Puerto Rico y en Washington y del carácter terrorista del grupo de personas que operaba bajo la denominación de Partido Nacionalista, por lo menos desde los sucesos de octubre de 1950 hasta después del ataque al Congreso y el arresto de Albizu y sus seguidores en 1954. *U.S.* v. *Lebrón*, 222 F.2d 531.

Según el testimonio de Cortés Ruiz, en sí mismo uno de los conspiradores convictos del delito de conspiración sediciosa, según hemos visto, *United States* v. *Lebrón*, supra, la Junta de Chicago, por él presidida en una ocasión, era una de las ramas del Partido Nacionalista de Puerto Rico, al igual que la de Nueva York. No obstante estar Albizu encarcelado como consecuencia de los sucesos de la semana del 30 de octubre de 1950, la actividad conspiradora seguía su curso culminando, ya indultado Albizu, en el ataque al Congreso el 1ro. de marzo de 1954. La declaración de Cortés Ruiz, aparte de reafirmar el *nexus* conocido entre la agrupación Partido Nacionalista y Albizu, por razón de ser éste su Presidente y líder, estableció de hecho el funcionamiento vivo del Partido Nacionalista de Puerto Rico y las Juntas Nacionalistas de Chicago y Nueva York y reveló extremos elocuentes de la coordinación de actividades entre esas Juntas y el Partido Nacionalista de Puerto Rico.([23]) *U.S.* v. *Lebrón*, supra.

El conjunto de la prueba ofrecida, las admisiones y el conocimiento judicial de los sucesos terroristas de la semana

---

([23]) El mensaje enviado por Albizu a Gonzalo Lebrón en Chicago y Julio Pinto Gandía en Nueva York con el testigo Cortés Ruiz en el sentido de que "se dejaran de tanta comedia de patriotismo" y que si el trato cruel que él (Albizu) recibía, lo estuviera recibiendo cualquiera de ellos, "barría el pedazo a tiros," unido al comentario de Hernández Vallé a Cortés Ruiz de que hiciera "la digestión de eso" debe entenderse en el sentido figurado en que dichas expresiones fueron usadas.

del 30 de octubre de 1950, aquí y en Washington, y de actos oficiales de funcionarios públicos, del carácter de la agrupación política denominada Partido Nacionalista de Puerto Rico, la reanudación por Albizu de las funciones de líder de dicha agrupación y la dirección de sus actividades al salir en libertad bajo el indulto condicional el 30 de septiembre de 1953, le sitúan en el mismo centro de la conspiración terrorista que, manifestada en los sucesos de la semana del 30 de octubre de 1950 en Puerto Rico y en Washington, se repitió nuevamente el 1ro. de marzo de 1954 con el ataque al Congreso por cuatro miembros de dicha agrupación, convictos, como hemos apuntado antes, junto a otros 13, por conspiración sediciosa. 18 U.S.C. sec. 2384. *U.S.* v. *Lebrón,* supra.

Las manifestaciones públicas de Albizu en el periódico El Imparcial el día 3 de marzo de 1954, antes de la revocación del indulto por el Gobernador, mediante las cuales justificaba el ataque de los cuatro nacionalistas al Congreso y calificaba el mismo de "jornada de sublime heroísmo," sin dejar de ser una manifestación de criterio en el ejercicio del derecho de libertad de palabra, constituyen un ingrediente más del cuadro total de la conspiración seguida por la agrupación por él dirigida, en plena actividad hacia un objetivo conocido e intentado ya previamente, pero no abandonado, que tiende a presentar dicho ataque como un "castigo" al cuerpo legislador de Estados Unidos, al cual señala como responsable de "la intervención militar" en Puerto Rico, manteniendo así en marcha, por el estímulo moral de su aprobación, la incitación a que siguieran las prácticas y métodos de violencia así empleados.

Los hechos ocurridos en la madrugada del 6 de marzo de 1954 cuando Albizu y sus seguidores Doris Torresola, Carmen María Pérez, Isabel Rosado Morales y José Rivera Sotomayor, todos miembros del Partido Nacionalista, hicieron resistencia y recibieron a tiros a los miembros de la Policía que fueron a diligenciar las órdenes de arresto, así como el

gran número de armas y municiones encontradas en el local, son aquí pertinentes, pues aunque en tiempo son unas horas posteriores a la revocación del indulto, son parte esencial de la conspiración ya previamente establecida, y de su estado de continuidad, e indicadores del carácter terrorista de dicha agrupación así como de la actividad y *nexus* de los allí presentes, que recibieron a tiros a la policía, con la conspiración en marcha. Debe tenerse presente que el acto ostensible que se requiere para una convicción, *en un proceso criminal* por conspiración, no tiene que demostrar necesariamente el delito sustantivo alegado en la acusación como objetivo de la conspiración, ni siquiera un acto que en sí sea de naturaleza delictiva. La función del acto ostensible en una conspiración es simplemente *para demostrar que ésta está en marcha* y que no es un mero proyecto que exista sólo en la mente de los conspiradores, ni tampoco un hecho consumado cuya existencia ya terminó. *Yates* v. *U.S.*, 354 U.S. 298, 1 L.Ed.2d 1356. Aquí la conspiración continuaba su curso con actos de violencia y terror y no con meras palabras. Y siendo uno sólo el objetivo, aunque varios los actos ostensibles llevados a cabo para realizarlos, ni importa dónde tuvieran éstos lugar, si en Puerto Rico, en Washington, Chicago o Nueva York, todos formaban parte del desarrollo de la conspiración a un mismo fin y eran admisibles contra Albizu para determinar su incumplimiento con la condición del indulto.

Bajo la norma de suficiencia de prueba de *Scales* v. *United States*, 367 U.S. 203, 6 L.Ed.2d 782; cf. *Noto* v. *United States*, 367 U.S. 290, 6 L.Ed.2d 836, que es la más exigente norma que para examinar la determinación del Gobernador hemos seguido en el análisis de la prueba en este procedimiento—a pesar de que no estamos frente a un proceso criminal—se satisfacen los requisitos para sostener la procedencia y razonabilidad de esa actuación ejecutiva. En consecuencia, desestimamos el segundo de los planteamientos de la peticionaria.

*Se sostiene la validez de la determinación del Gobernador revocando el indulto de Albizu por haber éste violado las condiciones impuestas en el mismo para su disfrute y se anula el auto expedido.*

El Juez Asociado Señor Pérez Pimentel concurre con el resultado. Los Jueces Asociados Señores Hernández Matos y Blanco Lugo disintieron en opinión emitida por este último.

—O—

Opinión disidente del Juez Asociado Señor Blanco Lugo, en la cual concurre el Juez Asociado Señor Hernández Matos

San Juan, Puerto Rico, a 10 de noviembre de 1964

No empece el esmero con que ha sido redactada la opinión de mayoría y del detenido análisis e intensa dedicación que la misma revela, no puedo convenir en que las admisiones de la parte peticionaria y la prueba—incluyendo el conocimiento judicial en que tan pesadamente se descansa—sean suficientes para satisfacer la norma de razonabilidad de la actuación ejecutiva al revocar el indulto concedido a Pedro Albizu Campos, y mucho menos de la causa probable para la imputación de un delito. No tengo dudas de que el largo tiempo transcurrido entre la fecha de la revocación del indulto—6 de marzo de 1954—y la de la audiencia ante este Tribunal— 25 de mayo de 1964—han perjudicado las oportunidades del demandado de traer otra evidencia que pudo haber tenido el Gobernador ante su consideración, y que, en el cumplimiento de su obligación de mantener el orden público, le indujeron a revocar el indulto. [1]

[1] Concurro plenamente con la disposición que se hace en la opinión de la mayoría respecto al planteamiento de la revocación sumaria del indulto sin previa vista. Añado que, a mi juicio, la reserva de que el indultado podría impugnar ante los tribunales de justicia, la revocación del mismo pudo haberse sujetado a la condición adicional de que ello se hiciera dentro de un período determinado, para proporcionar así la oportunidad de tener disponible y accesible toda la prueba que informó la actuación ejecutiva. Véase el escolio 3 de la opinión mayoritaria.

La opinión de mayoría parte del supuesto de que la prueba y las alegaciones no demuestran que la revocación del indulto concedido a Albizu Campos obedeciera a la comisión personal por éste de actos de violencia. Descansa exclusivamente en la existencia de una conspiración contra la seguridad pública, de la cual Albizu formaba parte, cuya intención era subvertir por la violencia o el terror el orden constitucional establecido, e irrespetar la voluntad del pueblo de Puerto Rico democráticamente expresada en las urnas. Se pretende vincular al reo con la conspiración a través de los siguientes elementos: 1—la admisión por la parte peticionaria de la alegación de que una vez en libertad en virtud del indulto concedídole Albizu fijó su residencia en los cuarteles generales de la agrupación denominada "Partido Nacionalista de Puerto Rico," *reanudó sus funciones como líder de dicha agrupación y en tal capacidad continuó dirigiendo las actividades de la misma;* 2—en el conocimiento judicial de que dicha agrupación era para las fechas indicadas una organización terrorista, apoyándose en *Guadalupe* v. *Bravo,* 71 D.P.R. 975 (1950) y *United States* v. *Lebrón,* 222 F.2d 531 (1955) ; 3—las actuaciones de varios miembros de la agrupación, especialmente la balacera a varios miembros del Congreso de Estados Unidos; 4—unas manifestaciones hechas por Albizu con motivo del ataque al Congreso; y, 5—la resistencia presentada por Albizu y otras personas cuando se intentó diligenciar la orden de arresto expedida con motivo de la revocación del indulto, así como el hallazgo subsiguiente de armas y municiones en el lugar en que dichas personas se encontraban.

A poco que se examine lo expuesto, el vínculo que une a Albizu con todos los hechos se deriva única y exclusivamente de su condición de líder de la agrupación, o sea, de que reanudó sus funciones como tal y en dicha capacidad continuó dirigiendo sus actividades. Sólo así le serían imputables los actos de los otros conspiradores. Es aquí en donde a mi juicio el demandado falló en establecer el nexo necesario.

La prueba por él aportada se encargó de desvirtuar la admisión que en tal sentido y que para fines de las alegaciones se hizo por el abogado de la parte peticionaria. A mi juicio estableció que Albizu no era efectivamente el *líder en funciones* de la agrupación nacionalista—puede aceptarse que era el líder titular o el símbolo de la causa—y que el estado de su salud era precario(²)—Cortés Ruiz creyó que estaba "muy enfermo"—no sólo física, sino mentalmente, pues atribuía su dolencia al "trato cruel que le estaban dando a él," que "le estaban aplicando rayos"; "que tratara de salir pronto de allí [se refiere a la habitación de Albizu en donde tuvo lugar la entrevista con el testigo] porque yo no sabía cómo evadirlo." Si algo tiende a señalar la declaración de Francisco Cortés Ruiz es que aun después de haberse concedido el indulto, la comunicación de las células de la agrupación en Chicago y Nueva York con San Juan era a través de Juan Hernández Vallé; que fue a éste a quien Cortés visitó en octubre de 1953 portando una carta de Gonzalo Lebrón, uno de los directores de la junta de Nueva York; y que fue Hernández quien le sugirió que visitara a Albizu y no fue hasta que Hernández llegó y gestionó el permiso que pudo ver a Albizu. Específicamente aceptó en el contrainterrogatorio que "*sabía que Hernández Vallé era el líder del partido en aquel entonces.*" No le atribuyo a la expresión de Albizu, coetánea con la queja sobre su estado de salud, sobre que "le dijera a Julio Pinto Gandía allá en Nueva York y a Gonzalo Lebrón Sotomayor en Chicago, que se dejaran de tanta comedia de patriotismo, que si el trato cruel que estaba recibiendo don Pedro Albizu Campos lo estuvieran recibiendo ellos . . . él [Albizu] barría el pedazo a tiros," la significación que se pretende tiene, pues la interpretación del sentido figurado fue obra de Hernández Vallé, "Paco, haz la digestión de eso."

---

(²) Precisa advertir que las razones aducidas en septiembre de 1953 para el ejercicio de la clemencia ejecutiva fueron estado de salud del confinado y . . . su avanzada edad."

Significativo es por de más que a Albizu no se le acusara por los sucesos del 6 de marzo de 1954 conjuntamente con las personas que le acompañaban, véase, *Pueblo* v. *Rivera Sotomayor*, Núm. 16401, res. en 10 de junio de 1960, ni por *conspiración sediciosa* bajo la Sec. 2384 del Título 18 del Código de Estados Unidos, véase, *United States* v. *Lebrón*, 222 F.2d 531 (1955), ni en compañía de Hernández Vallé, por violación a la Ley Núm. 53 de 10 de junio de 1948, véase, *Pueblo* v. *Hernández Vallé*, Crim. Núm. 15967.[3] Todos estos procesos se relacionan con los hechos acaecidos entre el indulto y su revocación.

Finalmente, las manifestaciones de Albizu a raíz de los sucesos en el Congreso no constituyen más que el ejercicio de su derecho a expresarse libremente, y aunque cargadas de un contenido de fervor patriótico, según lo entiende la agrupación a que pertenece, enmarca dentro de la expresión del indulto—índice claro del respeto del ejecutivo a los principios democráticos—de que "nada en este documento había de interpretarse como limitativo de la libertad de expresión de Pedro Albizu Campos, si tal es su interés, por luchar, por medios constitucionales y democráticos, por la independencia de Puerto Rico, u otras causas que interese." El calificativo de "sublime heroísmo" a que tanto énfasis se le ha dado podrá no corresponder con la opinión de la inmensa mayoría de los puertorriqueños, pero ni aun con el mayor esfuerzo de imaginación puede decirse que sea una incitación al uso de fuerza y violencia.

No creo necesario extenderme en el análisis de otros detalles de la prueba. Sólo deseo significar que no me satisface plenamente la presentada, y que por tal razón, disiento.

---

[3] Hernández Vallé fue convicto y sentenciado en 4 de enero de 1955 a una pena de 3 a 10 años de presidio. Fue indultado por el Gobernador en 19 de julio de 1957. Véase, *In re Hernández Vallé*, desaforo núm. 91. En 22 de septiembre de 1961 accedimos a su solicitud para que se le rehabilitara para el ejercicio de la profesión de abogado.